## EXHIBIT B

### FACTUAL BASIS – FRESENIUS KABI ONCOLOGY LIMITED

*The undersigned parties hereby stipulate and agree that if this matter had gone to trial, the United States would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

### A. Defendant Fresenius Kabi Oncology Limited

At times material to this case, defendant **Fresenius Kabi Oncology Limited** ("**FKOL**") was an Indian corporation with headquarters in Gurgaon, India. **FKOL** developed, manufactured, and distributed oncology drugs intended to treat patients in the United States.

Fresenius Kabi AG—a German corporation with offices in Bad Homburg, Germany—was the parent company to both **FKOL** and **FKOL's** sister company, Fresenius Kabi USA. Among other things, Fresenius Kabi USA was responsible for distributing certain drug products manufactured by **FKOL** within the United States. Fresenius Kabi AG was owned by Fresenius SE & Co. KGaA, a German corporation and global provider of healthcare products and services.

### B. The FDA and FDCA

The United States Food and Drug Administration ("FDA") was and is the agency of the United States responsible for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), and assuring, among other things, that drugs intended for use in humans were safe and effective for their intended uses. Pursuant to its statutory mandate, the FDA regulated the manufacture, processing, packing, labeling, and shipment in interstate commerce of drugs.

The FDCA defined the term "drug" as, among other things, an article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans; an article intended to affect the structure or any function of the body of humans; or an article intended for use as a component of a drug. 21 U.S.C. §§ 321(g)(1)(B), (C), & (D).

An "active pharmaceutical ingredient" (or "API") was any substance or mixture of substances intended to be used in the manufacture of a drug product and that, when so used, became an active ingredient in the drug product.

An "active ingredient" was any component of a finished dosage form drug that was intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans. 21 C.F.R. § 210.3(b)(7).

A "drug product" was a finished dosage form drug, for example, a tablet, capsule, or solution, that contained an active ingredient. 21 C.F.R. § 210.3(b)(4).

The FDCA prohibited the introduction or delivery for introduction into interstate commerce, or the causing thereof, of any drug that was adulterated. 21 U.S.C. § 331(a). Under the FDCA, a drug was deemed adulterated if the methods used in, or the facilities or controls used for, its manufacturing, processing, packing, or holding did not conform to or were not operated or administered in conformity with current good manufacturing practice ("cGMP") to assure that such drug met the requirements of the FDCA as to safety and had the identity and strength, and met the quality and purity characteristics, which it purported or was represented to possess. 21 U.S.C. § 351(a)(2)(B). Both APIs and drug products were subject to the adulteration provisions of the FDCA, which required that all drugs be manufactured in conformance with cGMP. *See* 21 U.S.C. §§ 321(g)(1), 351(a)(2)(B).

As used herein, the terms "current good manufacturing practice" and "cGMP" refer solely to those requirements and practices applicable under the FDCA, and included the implementation of oversight and controls over the manufacture of drugs to ensure quality, including managing the risk of, and establishing the safety of, raw materials, materials used in the manufacturing of drugs, and finished drug products. 21 U.S.C. § 351. Among other things, cGMP for the manufacture of APIs included the following practices:

a. The preparation and retention of a "batch production record" containing complete information relating to the production and control of each batch of API. A "batch" was a specific quantity of an API that was intended to have uniform character and quality, within specified limits, and was produced according to a single manufacturing order during the same cycle of manufacture. 21 C.F.R. § 210.3(b)(2).

b. The documentation of all tests and their results—including out-of-specification results—as part of the batch production record.

c. Except in specific circumstances not relevant here, out-of-specification batches should not be blended with other batches for the purpose of meeting specifications. Each batch incorporated into the blend should have been manufactured using an established process and should have been individually tested and found to meet appropriate specifications prior to blending. Blending processes should be adequately controlled and documented, and the blended batch should be tested for conformance to established specifications, where appropriate.

As part of its mission to enforce the FDCA and protect the public health, the FDA had the authority to enter and inspect at reasonable times all establishments at which prescription drugs or non-prescription drugs intended for human use were manufactured, processed, packed, or held for introduction into interstate commerce or after shipment in interstate commerce. 21 U.S.C. § 374(a)(1). When conducting such an

2

inspection, the FDA had the authority to inspect all things therein (including records, files, papers, processes, controls, and facilities) bearing on whether prescription drugs or non-prescription drugs intended for human use which were adulterated or misbranded, or which could not be lawfully manufactured, introduced into interstate commerce, or sold, or offered for sale by reason of any provision of the FDCA, had been or were being manufactured, processed, packed, transported, or held in any such place, or otherwise bearing on any violation of the FDCA. *Id.*

Upon conclusion of such an inspection, if significant deviations from the FDCA were observed, the FDA investigator issued a "Form 483," otherwise known as "Notice of Inspectional Observations," to set forth the cGMP deficiencies observed by the FDA investigator during the inspection. If the observations were significant, the FDA could issue a "Warning Letter" to notify the firm of the agency's observation that certain of its manufactured products appeared to be adulterated, and that, unless sufficient corrective actions were implemented, further regulatory action could be taken without notice. In some instances, if the observations were significant enough, FDA could proceed immediately to regulatory action such as seizure or injunction. 21 U.S.C. §§ 332, 334.

### C. FKOL's Active Pharmaceutical Ingredients for Oncology Drugs

**FKOL** owned and operated a manufacturing plant located in Kalyani, West Bengal, India (the "Kalyani plant"). The Kalyani plant was a unit of FKOL. The Kalyani plant engaged in the manufacture of APIs intended for incorporation into various oncology chemotherapy drug products—including Irinotecan, Gemcitabine, Paclitaxel, and Oxaliplatin—which were used to achieve prolongation of life in cancer patients. These drug products were indicated for use in the treatment of patients afflicted with, among other things, metastatic colon and rectal cancer (Irinotecan); pancreatic, ovarian, and metastatic breast cancer (Gemcitabine); bladder and esophageal cancer (Paclitaxel); and colorectal cancer (Oxaliplatin).

**FKOL** owned and operated a second manufacturing plant located in Baddi, Himachal Pradesh, India (the "Baddi plant"). The Baddi plant manufactured drug products—including Irinotecan, Gemcitabine, Paclitaxel, and Oxaliplatin—and used Kalyani plant APIs as components in the manufacture of these drug products. **FKOL** distributed Irinotecan, Gemcitabine, Paclitaxel, and Oxaliplatin drug products made with Kalyani plant APIs to customers in the United States where they were sold to hospitals and oncology clinics across the United States, including the State of Nevada.

**FKOL** also distributed Kalyani plant APIs directly to third party drug product manufacturers who, in turn, incorporated the APIs into drug products intended for distribution to oncology patients. Company A was a foreign subsidiary of a U.S. pharmaceutical company that purchased Irinotecan API from **FKOL** and incorporated it into drug products intended for distribution to the United States. Company B was a U.S. pharmaceutical company that purchased Irinotecan API from **FKOL** and incorporated it into drug products intended for distribution to various markets.

3

### D.  The FKOL Kalyani Plant's Unofficial Testing and Blending of APIs

Beginning as early as 2009 and continuing through January 2013, **FKOL's** Kalyani plant engaged in a practice of unofficial testing and blending of certain batches of APIs in violation of cGMP.  As stated above, cGMP included the practice of creating and maintaining batch production records that memorialized all tests and results—including out-of-specification results—obtained in the manufacturing process.  While **FKOL's** Kalyani plant maintained official batch production records, the plant also maintained "unofficial" manufacturing records which it kept separate and apart from batch production records.  **FKOL's** Kalyani plant used these unofficial records to document out-of-specification test results, and **FKOL's** Kalyani plant concealed these unofficial records from regulators, inspectors, and customers.

An "impurity" was any component present in an API that was not the API or an excipient of the API.  **FKOL's** practice of unofficial testing and blending was a clandestine means of identifying impurity levels in APIs and concealing out-of-specification impurity levels so that they did not appear in the official batch production record.  **FKOL's** practice went as follows:  **FKOL** ran tests to determine whether certain batches of API were out-of-specification due to the impurity level.  If a given batch was identified as out-of-specification, **FKOL** attempted to bring it within specification by blending the out-of-specification batch with an in-specification batch to achieve an in-specification impurity level.  **FKOL** did not document the unofficial tests, the out-of-specification test results, or the blending activity in the batch production record.  Rather, **FKOL** documented only the in-specification tests and results in the batch production record, making it appear to any third-party reviewer of the record that unofficial testing and blending had never occurred.

**FKOL's** Kalyani plant management knew that any deviation from cGMP in the manufacture of API carried some risk of causing an adverse impact on the purity or potency of a drug product.  **FKOL's** Kalyani plant management also knew that cGMP generally required manufacturers to document, investigate, and then reprocess or reject any API batch that failed to meet specifications due to the impurity level.  In order to avoid the time and financial costs associated with official records of out-of-specification API batches, certain **FKOL** Kalyani plant senior managers directed certain junior plant managers to implement the practice of concealing impurity levels in certain API batches through unofficial testing and unofficial blending.  In turn, those junior managers directed lower level employees to carry out unofficial testing and blending on an as-needed basis.

Some of the "testing" performed by **FKOL** employees at the Kalyani plant was the injection of samples of API material into High Performance Liquid Chromatography ("HPLC") machines.  The HPLC machines separated, identified, and quantified the constituent parts of API materials during the manufacturing process, and produced chromatographs of API impurities for plant technicians to analyze.  **FKOL** Kalyani plant employees primarily used a set of non-networked, standalone HPLC machines and computers to conduct unofficial tests and to record information concerning unofficial test results and the blending of some out-of-specification batches.  **FKOL** Kalyani plant

4

employees also used certain chemicals to facilitate these unofficial tests, and occasionally used hard copy documents to record unofficial test results and batch blending information. **FKOL** Kalyani plant employees also maintained Excel spreadsheets which they used to record information concerning unofficial testing and blending activity.

**FKOL** began to engage in unofficial testing and blending by as early as 2009 and continued this practice on an as-needed basis in the ensuing years. The practice became most prominent in mid-2012 with respect to Irinotecan API. At that time, an increased customer demand required the Kalyani plant to produce a greater amount of Irinotecan API than it had previously produced, and the Kalyani plant also saw an increase in the impurity levels of Irinotecan batches. **FKOL's** practice of unofficial testing and blending was a significant deviation from cGMP. **FKOL** earned at least $20,000,000 in proceeds from the sale of drug product in and/or for the United States containing API manufactured in violation of cGMP.

### E.  FKOL's False Representations Concerning its Manufacturing Practices

An API manufacturer that sought to market its API to a drug product manufacturer for incorporation into a finished dosage form drug could submit what was known as a "drug master file" ("DMF") to the FDA. A DMF was a confidential regulatory submission in which an API manufacturer could describe, among other things, the chemical formulation and manufacturing process for a given API. *See* 21 C.F.R. § 314.420(a). The FDCA did not require API manufacturers to submit DMFs to the FDA. However, if an API manufacturer chose to submit a DMF to the FDA, then the API manufacturer was required to keep the DMF current by notifying the FDA of any additions, changes, or deletions to its content. *See* 21 C.F.R. § 314.420(c).

In January 2013, **FKOL** had nine DMFs on file with the FDA, including DMFs for Irinotecan, Gemcitabine, Paclitaxel, and Oxaliplatin. These DMFs described the chemical makeup and manufacturing process of each API in significant detail. For instance, **FKOL's** Irinotecan DMF (designated "DMF 18818") described a highly regimented multi-step manufacturing process in which a plant extract called Camptothecin was dissolved from a solid into a liquid, combined with other chemicals, dried back into a solid, and ultimately processed into a completed API. The manufacturing process described in DMF 18818 did not permit unofficial testing or blending of out-of-specification finished batches of API with in-specification batches. Moreover, DMF 18818 explicitly represented that Irinotecan API would be made in compliance with cGMP.

**FKOL** submitted "Statements of Commitment" to the FDA in which **FKOL** represented that it would manufacture API in compliance with the specific manufacturing process described in a given DMF. For example, on or about December 13, 2012, **FKOL** submitted a Statement of Commitment to the FDA regarding DMF 18818, in which **FKOL** stated that DMF 18818 was current and that **FKOL** would "comply with the statements made in it." At the time **FKOL** submitted this Statement of Commitment to the FDA, **FKOL's** Kalyani plant was engaged in unofficial testing and blending of

Irinotecan API in violation of cGMP and in contravention of the manufacturing process described in DMF 18818.

**FKOL** made similar representations to its customers, including to Company A and Company B. On or about June 13, 2011, **FKOL** entered into a Quality Agreement with Company A in which **FKOL** agreed to manufacture Irinotecan API in compliance with cGMP, and specifically agreed to document all test results in batch production records. On or about December 18, 2012, **FKOL** entered into a Quality Agreement with Company B in which **FKOL** agreed to manufacture Irinotecan API in compliance with cGMP, and further agreed not to deliver any batch of API to Company B which had been manufactured from blending of different API batches. At the times that **FKOL** entered into these Quality Agreements with Companies A and B, **FKOL's** Kalyani plant was already engaged in unofficial testing and blending of Irinotecan API in violation of cGMP.

### F. FKOL's Concealment and Destruction of Records Immediately Prior to the 2013 FDA Inspection

On or about January 9, 2013, an FDA regulatory investigator (the "FDA investigator") notified the Site Head of the Kalyani plant (the "Site Head") that the FDA would be conducting an inspection of the Kalyani plant beginning on January 14, 2013. The FDA investigator explained that the inspection would evaluate **FKOL's** cGMP compliance in connection with the Kalyani plant's manufacturing activities and would focus on certain specific APIs manufactured at the plant that were intended for distribution to the U.S. market.

Upon receiving notice of the impending FDA inspection, the Site Head convened an in-person meeting with **FKOL** Kalyani plant managers— including managers in the Quality Assurance, Quality Control, and Production departments—to discuss the upcoming inspection. At the meeting, certain **FKOL** Kalyani plant managers agreed to remove certain records from the Kalyani plant, and delete certain records from computers at the Kalyani plant, which, if not removed and deleted, could result in the FDA identifying cGMP deficiencies in the plant's manufacture of APIs.

At the direction of certain **FKOL** Kalyani plant management, certain **FKOL** Kalyani plant employees identified four computers, two HPLC machines, and certain hard-copy documents—including personal diaries, R&D notebooks, chromatograms, and cGMP guideline printouts—which had been used by plant personnel to conduct unofficial testing and blending of APIs. Over the course of the next two days, certain **FKOL** Kalyani plant personnel packed the four computers, two HPLC machines, and hard-copy documents (the "removed records") into black plastic bags, loaded them into vehicles, and transported them off the plant's premises. Certain **FKOL** Kalyani plant employees stored the removed records in the residences of certain department heads and junior employees, and at an offsite company location.

Certain **FKOL** Kalyani plant employees also removed from the Kalyani plant certain chemicals used to conduct unofficial testing and blending, including certain raw materials, partially processed Irinotecan API, and chemicals used in HPLC machines. As with the removed records, certain **FKOL** Kalyani plant employees stored the removed chemicals in employee residences and at an offsite company location.

**FKOL**'s standard operating procedures required **FKOL** employees to document any removal of records or chemicals from the Kalyani plant. The referenced **FKOL** Kalyani plant personnel removed the above-described records and chemicals from the Kalyani plant in violation of **FKOL's** standard operating procedures and without any official documentation of the removal.

In addition, and at the direction of certain **FKOL** Kalyani plant managers, some **FKOL** Kalyani plant employees deleted from certain computers Excel spreadsheet documentation which contained evidence of the Kalyani plant's practice of unofficially testing and blending Irinotecan API (the "deleted records").

Prior to the **FKOL** Kalyani plant's removal and deletion of records in January 2013 and beginning as early as 2009, certain **FKOL** Kalyani plant personnel had routinely removed computers, documents, and equipment from the Kalyani plant in advance of regulatory inspections and customer audits. On these prior occasions, **FKOL** Kalyani plant employees removed computers, documents, and equipment containing evidence of the plant's noncompliance with cGMP. By removing and concealing records on these prior occasions, **FKOL** Kalyani plant personnel had sought to avoid receiving adverse findings in any regulatory inspections or customer audits evaluating **FKOL's** cGMP compliance. FKOL's pecuniary gain from API manufactured at the Kalyani Plant during the time that the plant was engaged in its practice of removing and concealing records in advance of inspections and audits, including from doing so in advance of the 2013 FDA inspection, was at least $45,000,000.

### G. The FDA's 2013 Inspection of the Kalyani Plant

From January 14 through 18, 2013, the FDA investigator conducted a pre-announced establishment inspection of the Kalyani plant (the "2013 inspection"). The **FKOL** Kalyani plant's removal and deletion of records notwithstanding, the FDA investigator identified deviations from cGMP in the plant's manufacture of APIs, including evidence of unofficial testing of APIs.

Although Kalyani plant personnel had conducted most of their unofficial testing using the non-networked computers and HPLC machines which had been removed from the plant prior to the FDA investigator's arrival, in some instances plant employees had used the local C drives of networked computers to record unofficial testing data. During the 2013 inspection, the FDA investigator reviewed data on a personal computer in the Quality Control department and found several HPLC raw data files stored on the local C drive of that computer. The HPLC data described unofficial testing of APIs conducted

by **FKOL** Kalyani plant quality control personnel; the data had been recorded only on the computer's C drive and not in the official batch production record.

The FDA investigator also encountered multiple instances of obstructive conduct by **FKOL** Kalyani plant employees during the inspection. For example, on one occasion the FDA investigator observed what appeared to be several pieces of foreign matter contained in a dryer used in the API manufacturing process. The investigator asked an **FKOL** Kalyani plant production manager to open the dryer so that the investigator could examine the foreign matter. The production manager claimed that he did not know how to open the dryer but would find a knowledgeable person capable of doing so. The FDA investigator continued with other aspects of the inspection and returned to the dryer approximately one hour later. Upon his return, the investigator found that the foreign matter had been removed from the dryer. When the investigator asked to examine the foreign matter that had been removed, a junior **FKOL** Kalyani plant employee denied that there had been any foreign matter in the first place, and suggested that the FDA investigator had simply witnessed light reflecting from a window. Later in the course of the inspection, the production manager provided a statement in which he admitted that he had panicked and advised a junior employee to clean the dryer during the FDA investigator's absence.

At the conclusion of the inspection, the FDA investigator issued **FKOL** an FDA Form 483 ("Form 483"). The Form 483 listed nine inspectional findings, many of which related to **FKOL's** unofficial testing of Irinotecan and other APIs. The FDA investigator issued the Form 483 based solely on his observations during the inspection, and without any knowledge or awareness of the removed records, the removed chemicals, the removed equipment, or the deleted records.

8

SO STIPULATED:

_____
Clint Narver
Assistant Director
United States Department of Justice


_____
Arvind Kumar Sharma
Corporate Representative
Defendant Fresenius Kabi Oncology Limited


_____
James P. Ellison, Esq.
Counsel for Defendant

9